**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**Tampa Division**

**DARIUS CLARKE, M.D. and**
**RESTORATIVE HEALTH and WELLNESS,**
**PLLC,**

     **Plaintiffs,**

**v.**

**HEALTHSOUTH CORPORATION n/k/a**
**ENCOMPASS HEALTH CORPORATION,**     **CASE No.  8:14cv778-T-33-VMC-TGW**

**and**

**REHABILITATION HOSPITAL**
**CORPORATION OF AMERICA, LLC d/b/a**
**ENCOMPASS HEALTH REHABILITATION**
**HOSPITAL OF RICHMOND,**

     **Defendants.**

## THIRD AMENDED COMPLAINT

Plaintiffs Darius Clarke, M.D., and Restorative Health and Wellness, PLLC (hereinafter "Relators" or "Plaintiffs"), by counsel, state as follows for their Third Amended Complaint against HealthSouth Corporation, now known as Encompass Health Corporation ("HealthSouth Corporation"); and Rehabilitation Hospital Corporation of America, LLC d/b/a Encompass Health Rehabilitation Hospital of Richmond and formerly doing business as HealthSouth Rehabilitation Hospital of Virginia (hereinafter "HealthSouth Richmond") (unless otherwise indicated, the two entities named herein shall be referred to, collectively and singularly, as "Defendant(s)").

## I.        NATURE OF THE CASE

1.        This action was originally filed to recover treble damages and civil penalties on behalf of the United States of America and 20 states in connection with the defrauding of the United States and respective states by HealthSouth Corporation.  In addition, the Plaintiffs, who were also acting as Relators under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §3729, *et seq*. ("FCA") sought relief in the original Complaint for retaliation and discrimination against HealthSouth Corporation and HealthSouth Richmond pursuant to the provisions of 31 U.S.C. §3730(h).

2.        HealthSouth Corporation merged with Encompass Health Corporation and this action was subsequently settled as between the post-merger entity, the United States and the various states.  Between approximately 2007 and the date of the settlements which occurred in mid-2019, HealthSouth Corporation improperly admitted and held patients in its inpatient rehabilitation facilities ("IRFs") in order to generate improper and excessive fees and fraudulent billings to Medicare, Medicaid, and other public and private health insurers including, among others, Tricare, in violation of federal and state law, including the FCA.

3.        This action was originally filed in the United States District Court for the Eastern District of Virginia, Richmond Division, on August 1, 2012.  On or about March 26, 2014, this action was transferred, at the request of the United States, to the United States District Court for the Middle District of Florida, Tampa Division.

4.        On June 28, 2019, after an extensive investigation that lasted several years, HealthSouth Corporation reached settlement agreements with the United States Department of Justice ("DOJ") and various states whereby it agreed to pay $48,000,000.00 to resolve allegations that some of its IRFs provided false information to Medicare to maintain their status

as an IRF, to earn a higher rate of reimbursement, and that some admissions to its IRFs were not medically necessary.

5.     To effectuate this settlement, the United States filed an Unopposed Motion to Intervene for Purposes of Settlement in this case and two others.  These motions were granted by the Court on June 27, 2019.

6.     Pursuant to the settlement agreements and this Court's June 27, 2019 Order, the United States, Dr. Clarke and Restorative Health and Wellness, PLLC ("RHW") filed a Joint Stipulation of Dismissal on July 2, 2019 in which, *inter alia*, Relators agreed to dismiss only their federal *qui tam* claims pursuant to the FCA against HealthSouth Corporation, preserving their retaliation claims pursuant to §3730(h), as well as their claims for attorneys' fees, costs and expenses pursuant to 31 U.S.C. §3730(d) which HealthSouth Corporation declined to address as part of the overall settlement.  The Court entered an Order approving the Stipulation of Dismissal on July 3, 2019.  As a reward for the successful prosecution and resolution of Relators' *qui tam* claims, the United States and various states agreed to pay them (and the relators from the other two intervened cases) a relators' share from the settlement proceeds.  Those payments have been made.  The various states paid the Relators the same relator share percentage as was paid by the United States on the federal settlement.

## II.     JURISDICTION AND VENUE

7.     The United States District Courts have exclusive jurisdiction over actions brought under the FCA pursuant to 31 U.S.C. §3732, and otherwise have jurisdiction under 28 U.S.C. §§1331 and 1345.  This Court also had subject matter jurisdiction over the claims brought under the state False Claims Acts filed under seal pursuant to 31 U.S.C. §3730(b) and 31 U.S.C. §3732(b), as well as supplemental jurisdiction pursuant to 28 U.S.C. §1367.

8.      Section 3732 (a) of the FCA provides that "any action under Section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by Section 3729 occurred."  The acts originally complained of herein occurred throughout the United States and within the Alexandria and Richmond Divisions of the United States District Court for the Eastern District of Virginia and the Tampa Division of the United States District Court for the Middle District of Florida.

9.      Under the FCA and the analogous state False Claims Act statutes, this Complaint was filed in camera and remained under seal until the Court ordered otherwise.  At all times relevant hereto, HealthSouth Corporation regularly conducted substantial business in the Commonwealth of Virginia and State of Florida, both directly and through subsidiaries and subsidiary hospitals like HealthSouth Richmond.

10.     Venue is appropriate in the Middle District of Florida pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391(b)(1) and (2).

### III.      DEFENDANTS

11.     Defendants are for-profit healthcare concerns providing healthcare services throughout the United States.  They are corporations organized and existing under the laws of the states of Alabama and Delaware and are duly authorized to conduct business within the state of Florida and the Commonwealth of Virginia.

12.     HealthSouth Corporation, now known as Encompass Health Corporation, is the largest owner and operator of IRFs in the United States.  HealthSouth Corporation earned net revenues of approximately $1.8 billion in 2009, $1.9 billion in 2010, $2.0 billion in 2011, $2.2

billion in 2012, $2.3 billion in 2013, $2.4 billion in 2014, $3.2 billion in 2015, and $3.7 billion in 2016.

13.     HealthSouth Corporation's IRF segment represented 80.3% of their net operating revenues for 2017 – approximately $3.19 billion of $3.97 billion.  With the HealthSouth/Encompass merger in 2018, the combined companies' IRF segment net revenues continued to rise to $3.24 billion, constituting approximately 76% of the company's net operating revenues for 2018.

14.     Rehabilitation Hospital Corporation of America, LLC, d/b/a Encompass Health Rehabilitation Health Hospital of Richmond ("HealthSouth Richmond") is a limited liability company organized and existing under the laws of the state of Delaware, and is duly authorized to conduct business within the Commonwealth of Virginia.  At times relevant hereto, it owned and operated an IRF located at 5700 Fitzhugh Avenue, Richmond, Virginia.

15.     HealthSouth Richmond is operated by, and a wholly owned subsidiary of, HealthSouth Corporation n/k/a Encompass Health Corporation.  All Defendants have common ownership, an integrated management structure, and their operations, operational plans, directives and practices are intertwined and applied, in a consistent and uniform manner, across the United States.  In terms of patient admission plans, practices and policies, HealthSouth Corporation controlled HealthSouth Richmond.  The plans, directives, practices and acts salient in this action and set forth in this Third Amended Complaint were initiated and caused by HealthSouth Corporation.  The managing officers of HealthSouth Richmond reported and answered to executives of HealthSouth Corporation at all times relevant to this Third Amended Complaint.

## IV.    PLAINTIFFS

16.    Darius Clarke, M.D., is a citizen and resident of the United States and the state of Texas.  He maintains his principal residence in Austin, Texas, and his business address at 401 Congress Avenue, Suite 1540, Austin, Texas 78701.  He is a physician who is board certified by the American Board of Physical Medicine in Rehabilitation and Physical Medicine, and in Rehabilitation and Brain Injury Medicine.  He is also board certified by the American Board of Preventive Medicine in Clinical Informatics.  From February, 2009, until August, 2010, Dr. Clarke served as the Medical Director for HealthSouth's rehabilitation hospital, an IRF, which is referred to herein as HealthSouth Richmond, located at 5700 Fitzhugh Avenue, Richmond, Virginia.

17.    Restorative Health and Wellness, PLLC, is a Texas Professional Limited Liability Company[1] which is wholly owned and operated by Dr. Clarke.  At all times relevant to this matter, Restorative Health and Wellness, PLLC, has been authorized to conduct business in the Commonwealth of Virginia and the state of Texas.

18.    HealthSouth Corporation and/or HealthSouth Richmond contracted for Dr. Clarke's services with and through Restorative Health and Wellness, PLLC, by which Dr. Clarke was employed.

## V.    FACTS

19.    On or about March 30, 2009, Restorative Health and Wellness, PLLC, then a Virginia professional limited liability company and now a Texas limited liability company, entered a "Medical Direction Agreement" pursuant to which Dr. Clarke was to provide program

---

[1]  It was converted from a Virginia Professional Limited Liability Company on or about August 6, 2015.

medical direction services by and through RHW.  The Medical Direction Agreement is attached

hereto as Exhibit 1 and is incorporated into this Third Amended Complaint by this reference.

20.    The Medical Direction Agreement was executed by Terry Maxhimer on behalf of

HealthSouth Richmond and HealthSouth Corporation.  At the time he executed the Medical

Direction Agreement, Maxhimer served as President – Central Region of HealthSouth

Corporation.  In addition to the other allegations set forth herein, this is evidence that the

Medical Direction Agreement was an agreement entered into not only by HealthSouth

Richmond, but also by HealthSouth Corporation.

21.    Material additional evidence exists that HealthSouth Corporation exerted

significant control over the terms and conditions under which services provided pursuant to the

Medical Direction Agreement were to be rendered.  Paragraph 2.7 of the Medical Direction

Agreement states as follows:

> **2.7  Federal Health Care Programs.**  [HealthSouth Richmond] [2]
> is covered by a Corporate Integrity Agreement (CIA) made
> between ***HealthSouth Corporation*** and the Office of Inspector
> General, which imposes certain requirements on contractors
> furnishing certain services on behalf of the Hospital.  In
> accordance with those requirements, Group [i.e., RHW] agrees to
> cooperate fully with HealthSouth to ensure that its employee, if
> expected to furnish or perform such services on behalf of Hospital
> for more than 160 hours per year under this agreement:
>
> (a)       will receive copies of ***HealthSouth Corporation's***
> Standards of Business Conduct, copies of ***HealthSouth
> Corporation's*** policies and procedures relevant to the Director's
> work for HealthSouth, and information about ***HealthSouth
> Corporation's*** compliance hotline;
>
> (b)       Will sign a certification that the Director has
> received, read, understood, and will abide by the terms of
> ***HealthSouth Corporation's*** Standards of Business Conduct; and

---

[2]  Referred to in the text of the Medical Direction Agreement as "HealthSouth" but defined therein as Rehabilitation Hospital Corporation of America, doing business as HealthSouth Rehabilitation Hospital of Virginia, i.e., the same entity defined in this Third Amended Complaint as HealthSouth Richmond.

(c)     Has not been excluded from participation in federal health care or procurement programs or been convicted of a criminal offense relating to a federal health care; and

(d)     Will receive specific training on relevant federal program reimbursement rules.

The Group certifies that it has not been excluded from participation in any federal health care or procurement program or has not been convicted of a criminal offense relating to a federal healthcare program, and agrees to immediately disclose to HealthSouth any such exclusion or conviction.

(Emphasis added.)

22.     The Medical Direction Agreement uses the term "HealthSouth" interchangeably to refer to both HealthSouth Richmond and HealthSouth Corporation itself.  It is also true that the Medical Direction Agreement required that any notice mandated or permitted under the Agreement be sent to both HealthSouth Richmond *and* to the legal department of HealthSouth Corporation at its Birmingham, Alabama address.  This further evidences the interlocking relationships and control of HealthSouth Corporation over HealthSouth Richmond and that both HealthSouth Richmond and HealthSouth Corporation were contracting to obtain the medical direction services of Dr. Clarke and, in any event, that HealthSouth Corporation controlled the terms and conditions pursuant to which Dr. Clarke rendered the medical direction services discussed herein.

23.     Prior to, during and after Dr. Clarke's term of providing medical direction services to the Defendants pursuant to the Defendants' policies, the Defendants knowingly made or used false or fraudulent statements and schemes, or caused fraudulent statements to be made and unlawful schemes to be carried out, to obtain, or aid in obtaining, the payment and approval of false Medicare, Champus, Tricare, Medicaid, F.A.M.I.S. and federal employee and veteran

health program claims.  As a result of these false or fraudulent statements and schemes, the

Federal and State Payors identified herein and in the original Complaint paid very significant

sums of money to Defendants to which they were not entitled.

A.    **Background**

24.    Dr. Clarke provided services from February of 2009 until November of 2010 as

the Medical Director for HealthSouth Richmond, the Defendants' rehabilitation hospital located

in Richmond, Virginia.

25.    This rehabilitation hospital is a 40 bed IRF and part of an organizational region

within HealthSouth Corporation that included Richmond, Charlottesville, Fredericksburg,

Petersburg and Loudon County.  Defendants operated rehabilitation hospitals in each of these

communities.  The executive in charge of this region for HealthSouth Corporation, at times

relevant to this action, was Jeff Ruskan, a Regional Vice President who, upon information and

belief, served as CEO of HealthSouth Richmond.

26.    The policies, plans, acts and omissions complained of herein were carried out on a

national basis.  Directives given to Defendants' Virginia facilities came directly from Terry

Maxhimer, Jeff Ruskan's superior.

27.    IRF's are entitled to receive reimbursement and payments from Medicare and

Medicaid, and other Federal and State payors, at elevated rates when compared to acute

hospitals, nursing facilities and other facilities.

28.    Since well before the original filing of this action, and through all times relevant

to this action, in order for Defendants' IRF's to be qualified to receive Federal and/or State Payor

IRF funding, patients were required to meet the following criteria:

a)    be able to tolerate three hours of physical therapy a day;

b)      require the services of a physician at least three times a week;

c)      require twenty-four (24) hour nursing care; and

d)      require the care of an interdisciplinary team led by a rehabilitation physician.

29.      In addition, in order for a rehabilitation hospital to receive Federal and/or State Payor IRF funding, at least 60% of the patients admitted annually were required to meet a discrete CMS 13 diagnosis which, at all times relevant to this matter, included any of the following conditions:  amputation, brain injury, burns, spinal cord injury, stroke, congenital deformity, hip fracture, joint replacements, major multiple trauma, multiple fracture, neurological disorders, multiple sclerosis, motor neuron disease, encephalopathy, ALS, Parkinson's disease, Guillain Barré, systemic vasculidities with joint inflammation, active rheumatoid arthritis, psoriatic arthritis, seronegative arthropathies, severe or advanced osteoarthritis and/or be 85 years of age or older and have undergone knee replacement and/or be morbidly obese and have undergone knee replacement.  Under regulatory guidelines each rehabilitation hospital had an annual cut-off date defining the year during which the CMS 13 diagnosis percentage must be met (the "CMS 13 Year").

**B.      Defendants' Fraudulent Practices**

30.      HealthSouth Corporation's senior executives directly placed significant pressure on Defendants' more junior executives, including executives of subsidiary hospitals such as HealthSouth Richmond, to commit the acts described in paragraphs 31 through 50, below.

31.      Defendants' executives and certain administrative leaders would exhort admission officials to "find a way" to admit patients who were otherwise not appropriate for inpatient rehabilitative care.  This would often be done through the use of bogus diagnoses. Likewise,

Defendants' executives would exhort clinical staff, including physicians, to retain patients for further treatment who were unsuitable for rehabilitation.

32.    HealthSouth Corporation IRFs around the country, including HealthSouth Richmond, employed field liaisons who are required to be clinically trained to evaluate candidates for inpatient rehabilitation services and are required to verify the candidates' suitability for services.  They are required under CMS regulations to conduct objective assessments of patients and the patients' qualifications for rehabilitation as outlined in paragraphs 26 through 29, above.  The rehabilitation physician, however, is the only professional qualified to make the decision regarding suitability for inpatient admission to an IRF.

33.    Defendants maintained a practice pursuant to which there were to be "no denials in the field."  In Virginia, this directive was given to HealthSouth Richmond field liaisons by Ruskan and Habenicht.  Ruskan and Habenicht directed liaison personnel never to decline referrals in the field and to find candidates for rehabilitation hospital services irrespective of their suitability and/or need for such services.  In effect and substance, HealthSouth Richmond's field liaisons automatically admitted referrals in the field and then shopped around for physicians to approve and admit the patient or, at times, have the patient transported to the hospital for admission without a physician's approval.  Upon information and belief, Maxhimer and other of Defendants' executives gave the same or similar "no denials in the field" directives to state Chief Executive Officers and other subordinate executives.  This constitutes a blatant violation of CMS regulations and Defendants' independent obligation to determine, prior to admission, that a patient is appropriate for rehabilitation hospital services.

34.    In addition, Defendants' executives manipulated the pre-admission and post-admission assessment process in order to ensure that patient records reflected suitability for

treatment.  To this end, HealthSouth Richmond's field liaison and admission officials would often "shop" rehabilitation physicians.  If a facility's Medical Director, which is a CMS mandated position, denied admission to a prospective patient, Defendants' executives would then approach other physicians to approve admission.  HealthSouth Richmond and other HealthSouth Corporation entities would often create "Associate Medical Director" positions to whom patients rejected by scrupulous Medical Directors would be referred for a second admission decision.  These associates would be paid a special stipend by HealthSouth Richmond and other HealthSouth Corporation entities in addition to any payments that would be received from Medicare or other Federal/State Payors.  In short, HealthSouth Richmond maintained an admissions process clearly intended to circumvent applicable state and federal laws relating to oversight.  This was done under the control and direction of Terry Maxhimer, Jeff Ruskan and HealthSouth Corporation.  Pursuant to Defendants' fraudulent processes, if HealthSouth Richmond's Medicare/CMS mandated Medical Director rejected a candidate as unsuitable for admission, they would then go to "Plan B" and have the patient seen by an "Associate Medical Director" or other physician in order to have the patient admitted.

35.    Defendants' executives and certain administrative leaders would exhort admission officials to "find a way" to admit patients who were otherwise not appropriate for inpatient rehabilitative care.  This would often be done through the use of bogus diagnoses.

36.    Defendants have knowingly, deliberately and systemically overcharged Federal and State Payors for rehabilitative services rendered to patients covered by those programs by basing discharge and retention decisions on profit considerations rather than a patient's clinical or functional status.  Federal and State Payors compensated Defendants for rehabilitation payments on a prospective payment system ("PPS") based on the patient's diagnosis and other

factors.  The applicable CMS and Medicare regulations establish "RAND dates[3]" based on national usage and practice which seek to regulate the patient's eligible number of treatment days given their condition.  A RAND date is typically issued as a guideline for length of stay of the patient and often governs the fee the hospital will receive from the Federal or State Payor. Defendants made a practice of discharging some patients early when such discharges were contraindicated in order to obtain greater profit under the RAND date system.  Likewise, when the calendar suited, i.e., close-out of the CMS 13 year was imminent, or when they did not have a robust backlog of potential new admissions, they would retain patients who should have been discharged in order to reap certain financial benefits of having a higher daily census.

37.     In order to meet the critical metric of achieving 60% of admissions with a CMS 13 diagnosis, Defendants engaged a routine practice of extending the stays of CMS 13 compliant patients, without medical justification, near the end of each CMS 13 Year.  These extensions were contraindicated, manipulated and fraudulently made so that each respective rehabilitation hospital would meet its required CMS 13 diagnosis ratio for the CMS 13 Year.  This practice was particularly egregious and essentially constituted the false imprisonment of patients who should have been discharged for the sole purpose of achieving the necessary CMS 13 metrics.

38.     Once a patient is admitted to a rehabilitation hospital, an interdisciplinary treatment team must meet once per week and agree upon the patient's plan of treatment and that further treatment is appropriate.  The interdisciplinary treatment team includes the patient's rehabilitation physician, nurse, case manager and physical therapist.  Under CMS and Medicare regulations, Defendants are expected to base discharge decisions on clinical symptoms, functional level and social factors.  No other factors are to be applied to the discharge decision. Defendants implemented practices and policies pursuant to which admission and discharge

---

[3]  RAND dates were originally determined by use of a formula or algorithm developed by the RAND Corporation.

decisions were based solely or largely on financial considerations as opposed to the patient's clinical condition.  More specifically, Defendants would routinely commit the following acts:

        a)      Unlawfully direct field liaisons not to deny referred patients upon completing field assessments;

        b)      Admit patients who either did not require or could not tolerate three hours a day of therapy;

        c)      Admit patients whose condition did not require assessment by a physician at least three times per week;

        d)      Admit patients who did not require 24 hours per day of nursing care;

        e)      Admit patients whose care did not require an interdisciplinary team approach led by a rehabilitation physician;

        f)      Admitted a patient population more than 40% of which never obtained a valid CMS 13 diagnosis; and

        g)      Discharged patients early under the RAND date PPS so as to garner more profit and/or to lower costs associated with a longer stay and retained patients who should be discharged when conditions were such that this would increase profit.

39.     Defendants' executives frequently exerted undue influence or pressure on Medical Directors to admit or retain inappropriate patients for in-patient rehabilitation care. Ruskan and Habenicht attempted to exert undue influence or sought a "second opinion" on admissions when Dr. Clarke questioned the suitability of rehabilitation hospitalization for patients.  Such undue influence was exerted in many of the following cases:

| Name | Admission/Assessment Date |
|------|---------------------------|
| Patient 1 | May 9, 2010 |
| Patient 2 | March 29, 2010 |
| Patient 3 | July 6, 2010 |
| Patient 4 | March 26, 2010 |
| Patient 5 | November 16, 2009 |
| Patient 6 | November 6, 2009 |
| Patient 7 | December 31, 2009 |
| Patient 8 | May 20, 2010 |
| Patient 9 | July 5, 2010 |
| Patient 10 | August 25, 2010 |
| Patient 11 | July, 2010 |
| Patient 12 | March 29, 2010 |
| Patient 13 | March 26, 2010 |
| Patient 14 | March 9, 2010 |
| Patient 15 | March 3, 2010 |
| Patient 16 | November 6, 2009 |
| Patient 17 | July 14, 2009 |
| Patient 18 | May 6, 2010 |
| Patient 19 | January 6, 2010 |
| Patient 20 | July 28, 2010 |
| Patient 21 | July 28, 2010 |
| Patient 22 | July 8, 2010 |
| Patient 23 | July 8, 2010 |
| Patient 24 | July 8, 2010 |
| Patient 25 | April 26, 2010 |
| Patient 26 | July 7, 2010 |
| Patient 27 | July 5, 2010 |
| Patient 28 | August 9, 2010 |
| Patient 29 | June 30, 2010 |
| Patient 30 | May 28, 2009 |
| Patient 31 | October 21, 2009 |
| Patient 32 | November 12, 2009 |
| Patient 33 | January 5, 2010 |
| Patient 34 | May 20, 2010 |
| Patient 35 | June 18, 2010 |
| Patient 36 | July 15, 2010 |

40.     Dr. Clarke cannot specifically identify at this time all patients for whom false claims were submitted as he is not in possession of those records.  Given the significant number of false claims, their scope and complexity, and that the Defendants' schemes were intentionally

hidden from the Plaintiffs, he is excused from the requirement of specifying each false claim.  To the best of Dr. Clarke's knowledge, the time period during which the unlawful conduct occurred began no later than early 2008, at a time when HealthSouth Corporation was already operating under a DOJ imposed Corporate Integrity Agreement arising from a fraud scheme in which they were required to pay the United States over $300,000,000 in approximately 2004.  The fraud in this case was exacerbated over time, and involved numerous patients nationwide.

41.    Several HealthSouth Corporation facilities experienced a dramatic rise in the use of a diagnosis known as "disuse myopathy" ("DM") in approximately 2009.

42.    While certain neurological disorders are covered under the CMS-13 list, DM was contrived, from whole cloth, by Defendants' marketing officials to boost admissions.

43.    HealthSouth Corporation established and disseminated a nationwide policy of admitting and retaining unqualified patients – and billing Federal and State Payors for services provided to these unqualified patients – under the DM medical diagnosis.

44.    DM is not a medically recognized pathology.  No medical reference text discusses, provides a definition of, or lists symptoms for DM let alone provides a standardized course of treatment.  Knowing that DM was invented by its marketing personnel, Defendants nonetheless admitted patients, retained patients and billed Federal and State Payors for treating patients with this fictitious condition using ICD-9 billing code 359.89 ("other myopathies").  Defendants knew they should not have billed for DM treatment using any billing code because DM is not a cognizable disease entitled to reimbursed treatment by the government.

45.    All of HealthSouth Corporation's DM-related claims were "false or fraudulent" because they rely on fabricated patient assessments which disqualify them from government reimbursement.  Specifically, in order to receive any payment from the government for treating a

Medicare patient, an IRF must perform a "comprehensive, accurate, standardized, and reproducible" assessment, also known as an Inpatient Rehabilitation Facility Patient Assessment Instrument, or IRF-PAI, of that patient.  42 CFR §412.606(c)(1).  Indeed, these requirements are explicitly incorporated into Medicare's "conditions of payment" for IRF's.  42 CFR §412.604. The Defendants' IRF-PAI's containing DM diagnoses are inaccurate, not standardized, and not reproducible because DM is not a medically recognized disease.  Because none of Defendants' claims for patients with an IRF-PAI DM diagnosis were entitled to payment, all such claims are actionable under the FCA as knowingly false or fraudulent.

46.     Even more important, the submission of intentionally inaccurate and false IRF-PAI's render the entire facility unqualified to receive the elevated payments available under the CMS system for rehabilitative care in an inpatient facility.

47.     As part of his initial disclosure to the United States and various states in September of 2012, Dr. Clarke provided documents labeled Clarke 00001-00668 to all affected Federal and State Payors several of which clearly demonstrate Defendants' use of the DM diagnosis. [4]  Whenever Defendants' corporate leaders identified a facility whose admissions were below average or below expectations, marketing personnel were dispatched to that facility with a PowerPoint presentation (Clarke 00060-71) and similar documents to train the local facility personnel on the use of the fraudulent DM diagnosis.  They did this in an intentional effort to boost admissions and revenues and knew, or acted in reckless disregard of the truth, that these actions would result in false charges to, and the receipt of unwarranted payments from, the Federal and State Payors.  Indeed, this is precisely what happened.

---

[4]  These documents were disclosed to and served upon the United States and affected states on September 12, 2012 (for the United States) and September 22, 2012 (for affected states).

48.     The Defendants have caused numerous submissions of false claims in violation of 31 U.S.C. §3729, et seq., and the state statutes cited herein by engaging in the above conduct.

49.     As a result of the Defendants' actions, the United States and the individual States have paid false claims directly or indirectly and spent millions of dollars on treatment arising from claims that were presented in violation of federal and state law as set forth herein.

50.     The states named as parties in the original Complaint were entitled to full recovery of all amounts paid by Medicare, Tricare, Medicaid, F.A.M.I.S., Champus and other federally funded programs as well as the Medicaid and F.A.M.I.S. programs of the State Payors as a result of the submission of false claims submitted or caused to be submitted by the Defendants.

**C.     Defendants Retaliated Against, Discriminated Against,
and Constructively Discharged Plaintiffs**

51.     The False Claims Act states, in part, at 31 U.S.C. §3730(h):

> **(h)  Relief from retaliatory actions.—**
>      **(1) In general.—**Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

52.     The Plaintiffs engaged in protected activity under 31 U.S.C. §3730(h) by opposing and attempting to correct the Defendants' wrongful conduct.

53.     The Plaintiffs communicated to the HealthSouth Richmond management, including to Jeff Ruskan, that they considered the practices alleged herein to be illegal and that they must be stopped.  The Defendants responded by deliberately circumventing Dr. Clarke in his role as Medical Director and seeking "second opinion" admission decisions from other

18

physicians.  These alternate admitting physicians would almost always admit the patient that Dr. Clarke deemed, or would have deemed, to be inappropriate for rehabilitation.

54.	By July of 2010, Dr. Clarke had complained on several occasions to Jeff Ruskan, HealthSouth Corporation's Vice President in charge of Virginia operations, and others, about the acts and omissions complained of in this Complaint.  He clearly stated to Ruskan, on several occasions, that the inappropriate admissions, retentions and discharges must be stopped.  Dr. Clarke also complained directly to Mr. Ruskan about Mr. Ruskan's instructions to low-level admissions officials that if Dr. Clarke deemed a candidate for admission to be ineligible or was likely to do so, they should take the proposed patient to another physician in order to gain admission.  Ruskan wrote the hospital staff as follows:

> [P]atients that have a lower functional level, i.e., max assist, that based on your previous historical experience you do not believe Dr. Clarke will accept and based on your clinical assessment/judgment feel they are a good inpatient rehabilitation candidate . . . . present these patients first to Dr. Vohra and subsequently to Dr. Giordano if needed for review. . . .

Clarke 00038.

In other words, Ruskan explicitly instructed admitting employees to shop the patient around until they found a physician who would admit them.  A similar written instruction from Ruskan, in the same document, instructed employees not to present cardiac and pulmonary patients to Dr. Clarke.  Dr. Clarke knew at this point that the situation was out of control.  This also had the effect of denying Dr. Clarke patients because staff would avoid bringing Dr. Clarke a large cohort of potential admissions.  His actual income and potential income fell materially because of this communication.

55.	Prior to Ruskan's instructions to staff noted in the preceding paragraph, Dr. Clarke had complained that the facility was admitting patients who were not qualified for

admission, that marketing personnel should not be making or affecting clinical judgment, that improper examinations and assessments of patients were being performed and that bogus diagnoses, such as disuse myopathy, were being used to justify admissions and claims to Federal and State Payors.

56.     Dr. Clarke, in his capacity as Medical Director, discovered that Defendants' management had written a document captioned "Document Physician Concurrence" which stated as follows:

> The preferred method to document physician concurrence with the admission recommendation for HealthSouth rehab physicians is to sign the pre-admission screening form (or documented electronically in ORBIT when such a feature becomes available) **prior to admission**.  Alternative methods (if the preferred method cannot be followed):  give written approval via fax or email that will be printed and retained in the patient's chart.  HIPAA and patient confidentiality rules apply.  Encrypted e-mail is a secure way of transmitting online information.  HealthSouth email accounts are encrypted and secure, so using this secure channel is the preferred method of e-mail approval.  ***Create a written order <u>prior to the admission order</u> which is dated, timed, and signed, which states something to the effect of: "I have reviewed and I concur with the findings and results of the pre-admission screen and approve admission for this patient."***

> Clarke00093 (emphasis added, except underline in original).

This document clearly encouraged lay staff to game the system and to use fraudulent tactics to achieve more admissions.

57.     Jeff Ruskan, the senior executive officer for HealthSouth Corporation's IRFs in Virginia, constantly clashed with Dr. Clarke.  He would force improper admissions on the staff for purely business reasons and improperly retained patients for the same reasons.  Dr. Clarke and Mr. Ruskan clashed on these subjects throughout Dr. Clarke's tenure with HealthSouth

Richmond.  Mr. Ruskan was blatant in his exhortations to staff and the illicit reasons behind his actions.  On January 4, 2010, he wrote the following email:

> We need a big admit today.  27 is horrible.  Please find CMS compliant patients for admission.  We denied a lot yesterday . . . . [ellipse in original]  ***Re-visit them to see if there is some way to categorize them as compliant.  I am going to take a beating in Birmingham tomorrow given this start.  Much scrutiny will be thrust upon us with this type of results [sic] (already started getting it yesterday).  We will also need to make staffing reductions if we cannot pull the census up into the mid 30's.***  A lot of pressure on the front end to get the admissions in the door . . . . . [ellipse in original]  Sorry just the nature of the job.  So work together, communicate and get the patients in the door.

> Emphasis added.

58.     Ruskan issued his "shop around" memorandum in an intentional effort to strip Dr. Clarke of his authority and to force him from his position as Medical Director as well as to gain the admission of patients who were not qualified for admission.  This communication was deeply humiliating to Dr. Clarke.

59.     When Dr. Clarke learned about communications like those set forth above, which are merely a few examples among numerous such emails and documents, and considered them in their totality, he realized that his choice was clear and essentially provided him with two paths: 1) he must effect deep and effective change within Defendants' Richmond facility or 2) he would have no choice but to leave.  If he was unable to achieve deep and meaningful change, then it would only be a matter of time before he was viewed as complicit in this culture of employing fraudulent tactics to increase profits.  When he attempted to effect change, he was shut off and circumvented as demonstrated by Clarke 00038.  This was humiliating and it caused him to lose revenue.  When he realized that his efforts would never bear fruit, he came to the conclusion that he had no choice but to leave.

60.     Several times between June of 2010 and Dr. Clarke's termination from Defendants' in November, Dr. Clarke would protest with Ruskan about the company's placing profit over compliance with law, regulation and patient welfare.  More specifically, Dr. Clarke protested the improper admission, retention and discharge of patients.  Ruskan's "shop around" memorandum to staff, instructing them to avoid Dr. Clarke in close-call situations, was itself an adverse action and act of discrimination against Dr. Clarke in violation of 31 U.S.C. §3730(h).  The intentional creation of a culture in which laws and regulations were routinely violated, and ignoring, indeed opposing, Dr. Clarke's efforts to remediate these violations in his capacity as Medical Director constituted acts of retaliation and discrimination against Dr. Clarke in violation of 31 U.S.C. §3730(h).

61.     Dr. Clarke's complaints to and clashes with Jeffrey Ruskan, and all of his constant efforts to ensure that Defendants complied with applicable law and regulation, constituted protected activity under 31 U.S.C. §3730(h).  The actions alleged herein constituted unlawful discrimination and retaliation because of that protected activity.

62.     As the Medical Director, Dr. Clarke knew that he could be held responsible for the actions and omissions of Defendants set forth in this Complaint.  The specter of civil or criminal liability attaching to him, as a result of the conduct of Defendants, Ruskan and others, became intolerable to Dr. Clarke.

63.     Despite providing excellent services to Defendants throughout the tenure of their contract, Dr. Clarke and Restorative Health and Wellness, PLLC, were faced with a choice of either continuing to work in an environment in which the law was being violated on a daily basis, and being complicit in these crimes, or to end the relationship.  The Plaintiffs had no choice but

to end the relationship and, as a result, they were constructively discharged and suffered significant pecuniary and non-pecuniary harm.

## COUNT I

### *Retaliation in Violation of the False Claims Act: Stated Against HealthSouth Richmond*

64.     All allegations set forth in paragraphs 1 through 63 of this Complaint are incorporated into this Count as if fully set forth herein.

65.     This Count is stated against HealthSouth Richmond.

66.     The Plaintiffs engaged in protected activity under § 3730(h) ultimately resulting in HealthSouth Richmond unlawfully retaliating and discriminating against them for same. HealthSouth Richmond humiliated Dr. Clarke by ignoring his clinical decisions and medical advice and, when they received information that they did not want to hear from Dr. Clarke, immediately sought opinions from other physicians in order to obtain the clinical decisions most financially advantageous to them.  This often resulted in improper treatment and false billings. Dr. Clarke found this intolerable, indeed HealthSouth Richmond intended to make Dr. Clarke's situation professionally intolerable, and Dr. Clarke and Restorative Health and Wellness were constructively discharged, and otherwise discriminated against as a result of the actions set forth above.  HealthSouth Richmond's conduct violated the anti-retaliation provisions of the False Claims Act 31 U.S.C. §3730(h).

67.     HealthSouth Richmond's conduct was the proximate and actual cause of significant economic and non-economic harm to Dr. Clarke and Restorative Health and Wellness, PLLC.  The types of harm the Plaintiffs have sustained include loss of pay and/or revenue sustained prior to the trial of this action, loss of future pay and/or revenue, and harm to business reputation.  In addition, Dr. Clarke has personally suffered emotional pain,

inconvenience, frustration, mental anguish, humiliation, loss of reputation, and loss of quality and enjoyment of life.

**WHEREFORE,** Plaintiffs, Darius Clarke, M.D., and Restorative Health and Wellness, PLLC, request that:

a)      Plaintiffs be awarded all compensation sufficient to make them whole for HealthSouth Richmond's violations of 31 U.S.C. §3730(h), including an award of lost revenue and/or back pay, and double damages as permitted under the statute;

b)      Plaintiff Darius Clarke, M.D. be awarded a sum sufficient to make him whole for all nonpecuniary damages he has suffered personally including emotional pain, inconvenience, mental anguish, humiliation, loss of reputation and loss of quality and enjoyment of life;

c)      Plaintiffs be provided with compensation for all special damages and injunctive or equitable relief, as may be appropriate, to prevent further harm to themselves and to prevent harm to others and the public caused by HealthSouth Richmond's retaliation against whistleblowers;

d)      Plaintiffs be awarded punitive damages under their retaliation claims in amounts sufficient to deter this conduct in the future;

e)      Plaintiffs be awarded all costs of this action, including attorneys' fees, costs and expenses pursuant to 31 U.S.C. §3730(d) and 31 U.S.C. §3730(h); and

f)      The Plaintiffs recover interest from the dates all sums are due and such other relief as the Court deems just and proper.

**COUNT II**

***Retaliation in Violation of the False Claims Act:***
***Stated Against HealthSouth Corporation***

68.     All allegations set forth in paragraphs 1 through 63 of this Complaint are

incorporated into this Count as if fully set forth herein.

69.     This Count is stated against HealthSouth Corporation.

70.     The Plaintiffs engaged in protected activity under § 3730(h) ultimately resulting

in HealthSouth Corporation unlawfully retaliating and discriminating against them for same.

HealthSouth Corporation directed or directly caused HealthSouth Richmond to impose unlawful,

unethical, fraudulent and dangerous standards of practice upon its employees and contracted

clinical staff, including Dr. Clarke and those similarly situated to him.  HealthSouth Corporation

humiliated Dr. Clarke, or directly caused HealthSouth Richmond to humiliate Dr. Clarke, by

ignoring his clinical decisions and medical advice and, when they received information that they

did not want to hear from Dr. Clarke, immediately sought opinions from other physicians in

order to obtain the clinical decisions most financially advantageous to them.  This often resulted

in improper treatment and false billings.  Dr. Clarke found this intolerable, indeed HealthSouth

Corporation intended to make Dr. Clarke's situation professionally intolerable, and Dr. Clarke

and Restorative Health and Wellness were constructively discharged, and otherwise

discriminated against as a result of the actions set forth above.  HealthSouth Corporation's

conduct violated the anti-retaliation and anti-discrimination provisions of the False Claims Act,

31 U.S.C. §3730(h).

71.     HealthSouth Corporation's conduct was the proximate and actual cause of

significant economic and non-economic harm to Dr. Clarke and Restorative Health and

Wellness, PLLC.  The types of harm the Plaintiffs have sustained include loss of pay and/or

revenue sustained prior to the trial of this action, loss of future pay and/or revenue, and harm to business reputation.  In addition, Dr. Clarke has personally suffered emotional pain, inconvenience, frustration, mental anguish, humiliation, loss of reputation, and loss of quality and enjoyment of life.

**WHEREFORE,**  Plaintiffs, Darius Clarke, M.D., and Restorative Health and Wellness, PLLC, request that:

a)      Plaintiffs be awarded all compensation sufficient to make them whole for HealthSouth Corporation's violations of 31 U.S.C. §3730(h), including an award of lost revenue and/or back pay, and double damages as permitted under the statute;

b)      Plaintiff Darius Clarke, M.D. be awarded a sum sufficient to make him whole for all nonpecuniary damages he has suffered personally including emotional pain, inconvenience, mental anguish, humiliation, loss of reputation and loss of quality and enjoyment of life;

c)      Plaintiffs be provided with compensation for all special damages and injunctive or equitable relief, as may be appropriate, to prevent further harm to themselves and to prevent harm to others and the public caused by HealthSouth Corporation's retaliation against whistleblowers;

d)      Plaintiffs be awarded punitive damages under their retaliation claims in amounts sufficient to deter this conduct in the future;

e)      Plaintiffs be awarded all costs of this action, including attorneys' fees, costs and expenses pursuant to 31 U.S.C. §3730(d) and 31 U.S.C. §3730(h); and

f)      The Plaintiffs recover interest from the dates all sums are due and such other relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs request a jury trial on all issues raised in this Third Amended Complaint.

Respectfully submitted,

**DARIUS CLARKE, M.D. and RESTORATIVE HEALTH AND WELLNESS, PLLC**

By:     */s/ James H. Shoemaker, Jr.*
Of Counsel

James H. Shoemaker, Jr.
Virginia State Bar No. 33148
*Admitted Pro Hac Vice*
Scott L. Reichle
Virginia State Bar No. 40016
*Admitted Pro Hac Vice*
Patten, Wornom, Hatten & Diamonstein, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
(757) 223-4500
(757) 223-4518 (facsimile)
jshoemaker@pwhd.com
sreichle@pwhd.com

John S. Vento
Florida Bar No. 329381
Trenam Kemker
101 E. Kennedy Boulevard
Suite 2700
Tampa, Florida  33601
(813) 227-7483
(813) 227-0483 (facsimile)
JVento@trenam.com

Kenneth R. Yoffy
Virginia State Bar No. 20549
*Admitted Pro Hac Vice*
C. Thomas Turbeville, Jr.
Virginia State Bar No. 30641
*Admitted Pro Hac Vice*
Yoffy and Turbeville, P.L.C.
4805 Courthouse Street
Williamsburg, Virginia 23188

(757) 259-0800
757-259-4408
kyoffy@mac.com
tomtlaw@mac.com

## <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I will electronically file the foregoing with the Clerk of Court using the CM/ECF system on March 11, 2020, which will then send a notification of such filing (NEF) to all counsel of record.

*/s/ James H. Shoemaker, Jr.*
Virginia State Bar No. 33148
*Admitted Pro Hac Vice*
Patten, Wornom, Hatten & Diamonstein, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
(757) 223-4500
(757) 223-4518 (facsimile)
jshoemaker@pwhd.com