UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DARIUS CLARKE, M.D., et al.,

    Plaintiffs,

v.                       Case No. 8:14-cv-778-T-33AAS

HEALTHSOUTH CORPORATION, et al.,

    Defendants.

_____/

**ORDER**

This matter comes before the Court upon consideration of Defendants HealthSouth Corporation and Rehabilitation Hospital Corporation of America, LLC's Motion to Exclude Expert Testimony, filed on August 27, 2020. (Doc. # 184). Plaintiffs Darius Clarke, M.D., and Restorative Health and Wellness, PLLC responded on September 10, 2020. (Doc. # 186). For the reasons that follow, the Motion is granted in part and denied in part.

I.   **Background**

In the instant action, Dr. Clarke and Restorative Health and Wellness (a professional limited liability company wholly owned and operated by Dr. Clarke) (collectively, "Dr. Clarke") seek relief against Dr. Clarke's former employer — Rehabilitation Hospital Corporation of America — and its

1

owner — HealthSouth Corporation — (collectively "HealthSouth") under the anti-retaliation provision of the False Claims Act (FCA), 31 U.S.C. § 3730(h). (Doc. # 139). Dr. Clarke began working for HealthSouth in February 2009 as an attending physician and medical director. (Id. at ¶ 16). According to Dr. Clarke, while at HealthSouth he discovered that HealthSouth was fraudulently manipulating admissions procedures to maintain "Intermediate Rehabilitation Facility" (IRF) status for its hospitals. (Id. at ¶ 34). Dr. Clarke alleges that once he discovered these fraudulent practices, the "specter of civil or criminal liability" forced him to resign in August 2010. (Id. at ¶¶ 59, 62-63).

Dr. Clarke identifies two main activities that allegedly compelled him to quit. First, Dr. Clarke claims HealthSouth frequently pressured staff to use the diagnosis of "disuse myopathy" (DM) to qualify patients as appropriate for IRF care. (Id. at ¶¶ 39, 41-45). According to Dr. Clarke, DM is a completely fictitious disease, and this pressure led to inappropriate patients being admitted to HealthSouth. (Id.).

Second, Dr. Clarke claims that clinical liaison Susan Habenicht would inappropriately "shop around" patients. (Id. at ¶¶ 57-58). According to Dr. Clarke, after he denied a patient, Habenicht would present the same patient to

2

alternate physicians who would "almost always admit the patient that Dr. Clarke deemed, or would have deemed, to be inappropriate for [admission]." (Id. at ¶ 53).

Dr. Clarke claims that because of these practices, he was "faced with a choice of either continuing to work in an environment in which the law was being violated on a daily basis, and being complicit in these crimes, or to end the relationship [with HealthSouth]." (Id. at ¶¶ 59, 62, 63). Therefore, his voluntary termination in August 2010 was a "constructive discharge" in violation of 31 U.S.C. §3730(h).

As part of discovery, Clarke retained Suzanne Groah, M.D., "as an expert witness qualified to opine with regard to whether HealthSouth's practices, viewed objectively, were fraudulent or unlawful, and intolerable to any physician and medical director of an IRF in the position of Dr. Clarke." (Doc. # 186 at 3).

Dr. Groah has worked as an attending physician at several inpatient rehabilitation hospitals. (Doc. # 184-3 at 17:25-18:14). Although Dr. Groah has never worked as a medical director at an inpatient rehabilitation hospital (Id.), she is currently the Chief of the Paralysis, Rehabilitation, and Recovery Program at National Rehabilitation Hospital in Washington, DC. (Id. at 12:10-13:11; Doc. # 184-1 at 2). She

has also taught rehabilitation medicine at Georgetown University since 2005. (Doc. # 184-1 at 3).

Based on her experience as a rehabilitation physician, Dr. Groah concludes in her expert report:

> A reasonable physician would find any one of numerous adverse conditions and actions that Dr. Darius Clarke was experiencing at HealthSouth Corporation n/k/a Encompass Health Corporation to be professionally intolerable. These adverse conditions and actions include those events described in paragraphs 1 through 11 below and can be summarized as follows: non-clinical management directing admissions personnel to avoid presenting cardiac, pulmonary and low-functioning patients to Dr Clarke for admission; non-clinical management applying pressure to admit patients not suitable for inpatient rehabilitation; non-clinical management applying pressure to use improper diagnoses to justify admissions; and non-clinical management applying pressure to retain patients when discharge was clinically indicated.

(Doc. # 184-2 at 1).

In reaching this conclusion, Dr. Groah also opines that: (1) DM is not an "accepted diagnosis used in medical rehabilitation;" (2) HealthSouth "knowingly made fraudulent claims;" and (3) that HealthSouth staff "circumvent[ed]" Dr. Clarke when admitting patients. (Id. at 1, 4-5).

HealthSouth moves to exclude this testimony, arguing that (1) the testimony offers nothing more than what counsel can argue to the jury; (2) Dr. Groah did not apply a reliable methodology to reach her conclusion; (3) Dr. Groah is not

qualified to offer an opinion on what is "professionally intolerable." (Doc. # 184).

Dr. Clarke has responded. (Doc. # 186) and the Motion is ripe for review. For the reasons below, the Motion is granted in part and denied in part.

## II.  **Legal Standard**

Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Implementing Rule 702, Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), requires district courts to ensure that any and all scientific testimony or evidence admitted is both relevant and reliable. See Id. at 589-90. Such Daubert analysis also applies to non-scientific expert testimony. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999). District courts must conduct this gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert

testimony.'" Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005).

In determining whether an expert opinion is admissible, the district court must assess whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Hendrix v. Evenflo Co., 609 F.3d 1183, 1194 (11th Cir. 2010). The proponent of the expert testimony bears the burden of showing, by a preponderance of the evidence, that the testimony satisfies each of these requirements. Id.

"An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). However, "testifying experts may not offer legal conclusions." Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1112 n.8 (11th Cir. 2005). Only the Court may instruct the jury on relevant legal standards. See, e.g., Royal Marco Point 1 Condo. Ass'n v. QBE Ins. Corp., No. 2:07-cv-16-FtM-99SPC, 2011 WL 470561, at *4 (M.D. Fla. Feb. 2, 2011) ("[A]n expert witness may not offer a legal conclusion.").

### III. **Analysis**

#### 1. **Qualifications**

The first question under Daubert is whether the proposed expert witness is qualified to testify competently regarding the matters he intends to address. City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 563 (11th Cir. 1998). An expert may be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702.

"This inquiry is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." Clena Invs., Inc. v. XL Specialty Ins. Co., 280 F.R.D. 653, 661 (S.D. Fla. 2012) (citations and internal quotation marks omitted). The Court is mindful that its "gatekeeper role under Daubert 'is not intended to supplant the adversary system or the role of the jury.'" Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) (quoting Allison v. McGhan, 184 F.3d 1300, 1311 (11th Cir. 1999)).

HealthSouth argues that Dr. Groah is not qualified to opine on what a reasonable person would consider an "intolerable" workplace. (Doc. # 184 at 16). HealthSouth continues that Dr. Groah is a practicing rehabilitation

physician, but she has no "experience analyzing what the human mind may consider 'intolerable' in the workplace." (Id.).

Dr. Clarke responds that Dr. Groah has "decades of experience as a physician and medical director." (Doc. # 186 at 9). This time in the field qualifies her to opine on what kind of work environment a physician and medical director may reasonably be expected to tolerate. (Id.).

The Court agrees with Dr. Clarke that Dr. Groah is qualified to opine on the general duties and responsibilities of rehabilitation physicians and medical directors, the general practices of rehabilitation hospitals, and the current state of the rehabilitation field (including disputes over diagnoses like DM, and what a reasonable physician in the field would find tolerable). Dr. Groah has not only worked in the rehabilitation field as a physician, she has taught the subject for several years and served as a clinical instructor. (Doc. # 184-1). She has also served as a medical director and chief at the Santa Clara Valley Medical Center and the National Rehabilitation Hospital. (Id.).

This kind of relevant experience, both in the rehabilitation field and as a medical director, satisfies the "minimally qualified" standard under Daubert. See Hendrix, 255 F.R.D. at 578 (an expert's "qualification to offer opinion

8

at trial may be based on any combination of 'knowledge, skill, experience, training, or education'; he need not be a leading authority in the field") (citing Leathers v. Pfizer, Inc., 233 F.R.D. 687, 692 (N.D. Ga. 2006)); Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006) ("Most courts have held that a physician with general knowledge may testify regarding medical issues that a specialist might treat in a clinical setting."). Dr. Groah is qualified to opine on the general rehabilitation field, including diagnoses like DM, the duties of medical directors, and what a reasonable physician in the that field would find tolerable.

### 2.   **Reliability**

Defendants also contest the reliability of Dr. Groah's testimony. Expert testimony must be "based on sufficient facts or data" and it must be "the product of reliable principles and methods." Fed. R. Evid. 702(a). Experts relying on experience must explain "how that experience is reliably applied to the facts.'" United States v. Frazier, 387 F.3d 1244, 1261 (11th Cir. 2004) (citations omitted).

HealthSouth argues that Dr. Groah "applies no methodology whatsoever" to reach her opinion. (Doc. # 184 at 12). According to HealthSouth, Dr. Groah's expert report contains "nothing more than ipse dixit reasoning devoid of

any substantive analysis," and the Court is "not required to simply take Dr. Groah at her word." (Id. at 3, 13).

Additionally, HealthSouth argues that Dr. Groah based her opinion on an "incomplete picture" because she relied entirely on Dr. Clarke's interpretation of events. (Id. at 14-15). According to HealthSouth, Dr. Groah failed to verify the accuracy of Dr. Clarke's statements, review any other materials, or interview any other witnesses, therefore her testimony is one-sided. (Id.). Dr. Clarke responds that Dr. Groah "carefully explains" the factual basis for her opinions. (Doc. # 184-2).

Dr. Groah establishes an adequate factual basis for her opinion. In her report, Dr. Groah does not solely rely on Dr. Clarke's testimony. In addition to phone interviews with Dr. Clarke, Dr. Groah also cites specific emails between HealthSouth staff, Powerpoint presentations disseminated by HealthSouth, and internal HealthSouth documents from which she drew her conclusion. (Doc. # 184-2). Dr. Groah states that she reviewed over one hundred pages of documents to form her opinion. (Id. at 7). A practicing rehabilitation physician with several years of experience could draw an informed opinion from this factual basis. The Court is satisfied that Dr. Groah applied her considerable experience

10

in the rehabilitation field to the facts to form her conclusions. <u>Frazier</u>, 387 F.3d at 1261.

As for her opinion on DM, in her deposition, Dr. Groah explains that she formulated her opinion on DM from literature on critical illness myopathies. (Doc. # 184-3 at 25:20-26:8). Importantly, Dr. Groah cites two examples of such literature in her expert report. (Doc. # 184-2 at 3). The Court is satisfied that a practicing rehabilitation physician could reliably form a conclusion on a disease in her field after reading relevant literature.

To the extent HealthSouth argues that Dr. Groah's testimony is biased because she relies on Dr. Clarke's statements, or incomplete because she failed to verify Dr. Clarke's statements, such objections go to the weight and credibility of Dr. Groah's testimony, rather than its admissibility. <u>See</u> <u>Hurst v. United States</u>, 882 F.2d 306, 311 (8th Cir. 1989) ("Any weaknesses in the factual underpinnings of [the expert's] opinion go to the weight and credibility of his testimony, not to its admissibility.").

3.    **Assistance to Trier of Fact**

Defendants also argue Dr. Groah's testimony will not be helpful to the jury. Expert testimony must "assist[] the trier of fact, through the application of scientific, technical, or

11

specialized expertise, to understand the evidence or to determine a fact in issue." Rink, 400 F.3d at 1292 (citation omitted). "When the trier of fact is 'entirely capable of determining' issues in the case 'without any technical assistance from . . . experts,' expert testimony is unhelpful and must be excluded from the evidence." Hendrix, 255 F.R.D. at 579 (citation omitted).

Furthermore, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262–63 (citation omitted).

Lastly, testimony is not helpful if it "merely tell[s] the jury what result to reach." Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990). "An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). But "testifying experts may not offer legal conclusions." Cook, 402 F.3d at 1112 n.8. Only the Court may instruct the jury on relevant legal standards. See Hibbett Patient Care, LLC v. Pharms. Mut. Ins. Co., No. CV 16-0231-WS-C, 2017 WL 2062955, at *2 (S.D. Ala. May 12, 2017) ("After all, '[e]ach courtroom comes equipped with a "legal expert," called a judge, and it is his or her province

alone to instruct the jury on the relevant legal standards.'" (internal citations omitted)).

HealthSouth argues that Dr. Groah's conclusion does no more than "rubber-stamp what Dr. Clarke must prove at trial." (Doc. # 184 at 11). Specifically, Dr. Groah's opinion that HealthSouth created a "professionally intolerable" workplace is no more than what HealthSouth's lawyers must argue in order to prove constructive discharge. (Id.).

Dr. Clarke responds that Dr. Groah's expert report does not contain just one opinion, but several. (Doc. # 186 at 6). Dr. Clarke points out that Dr. Groah opines not only on the professionally intolerable environment of HealthSouth, but also (1) the validity of DM as a medical diagnosis and (2) the practice of "physician shopping." (Id. at 7-8). Dr. Clarke argues both issues are important to the resolution of this case, and expert testimony on both topics will be helpful to a jury that is likely not composed of physicians.

Dr. Clarke also argues that Dr. Groah's main conclusion — that is, that the HealthSouth environment was professionally intolerable — should be admitted because "[t]he legal and ethical duties and responsibilities of a physician and medical director are not subjects within the ordinary knowledge of a juror." (Doc. # 186 at 8).

13

The Court agrees with HealthSouth that several of Dr. Groah's statements constitute improper legal opinions. First, Dr. Groah's opinion that the working conditions at HealthSouth were "professionally intolerable" must be excluded. (Doc. # 184-2 at 1). Dr. Clarke alleges that his termination was not voluntary, but rather that HealthSouth "constructively discharged him." (Doc. # 139 at ¶ 63). To prove constructive discharge, Dr. Clarke must show that "the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." Wolf v. MWH Constructors, Inc., 34 F. Supp. 3d 1213, 1225 (M.D. Fla. 2014) (citations omitted).

Therefore, whether the working conditions at HealthSouth were "professionally intolerable," and thus would force any "reasonable" person to resign, is the very question that a jury would decide should this case go to trial. See Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp., N.V., 14 F. Supp. 2d 391, 404 (S.D.N.Y. 1998) ("Whether a party acted with objective reasonableness is a quintessential common law jury question."). By concluding that HealthSouth's actions were "professionally intolerable," Dr. Groah "merely tell[s] the jury what result to reach" in the case. Montgomery, 898 F.2d

at 1541. Such testimony is not helpful to the trier of fact and is therefore excluded. Id.

Second, Dr. Groah's opinion that HealthSouth acted "fraudulently" or "made fraudulent claims" must be excluded. (Doc. # 184-2 at 4-5). Expert witnesses "are prohibited from testifying as to questions of law regarding the interpretation of a statute, the meaning of terms in a statute, or the legality of conduct." Dahlgren v. Muldrow, No. 1:06-cv-65-MP-AK, 2008 WL 186641, at *5 (N.D. Fla. Jan. 18, 2008). Instead, "[t]he determination of which law applies and what the law means is for the Court to decide." Id.

By concluding that HealthSouth acted fraudulently, Dr. Groah renders a legal opinion that HealthSouth violated the FCA. An expert "may not testify to the legal implications of conduct; the court must be the jury's only source of law." Montgomery, 898 F.2d at 1541. Accordingly, the Court excludes Dr. Groah's testimony on the legality of HealthSouth's conduct.

Notwithstanding these exclusions, the Court declines to exclude Dr. Groah's testimony on the rehabilitation hospital industry in general. See, e.g., Levin v. Dalva Bros., Inc., 459 F.3d 68, 79 (1st Cir. 2006) ("Expert testimony on industry standards is common fare in civil litigation."). Dr. Groah's

testimony is admissible to the extent she addresses industry norms (including industry norms surrounding DM as a medical diagnosis and the practice of physician shopping) and whether HealthSouth's actions departed from industry custom. See Id. (allowing an expert to testify on whether a certain custom comported with industry standard).

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  Defendants HealthSouth Corporation and Rehabilitation Hospital Corporation of America, LLC's Motion to Exclude Expert Testimony (Doc. # 184) is **GRANTED IN PART AND DENIED IN PART.**

(2)  Dr. Groah's opinion on whether HealthSouth's conduct created a professionally intolerable environment, whether Dr. Clarke acted reasonably in leaving, whether HealthSouth violated the FCA, or on whether HealthSouth acted "fraudulently" is excluded.

(3)  The Court declines to exclude Dr. Groah's opinion on the regular customs of rehabilitation hospitals, including the practice of physician shopping and the legitimacy of disuse myopathy as a diagnosis.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 14th day of January, 2021.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE