UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DARIUS CLARKE, M.D., et al.,

    Plaintiffs,

v.                                    Case No. 8:14-cv-778-T-33AAS

HEALTHSOUTH CORPORATION, et al.,

    Defendants.

_____/

**ORDER**

This matter comes before the Court upon consideration of Defendants Healthsouth Corporation and Rehabilitation Hospital Corporation of America, LLC's Motion for Summary Judgment, filed on August 27, 2020. (Doc. # 174). Plaintiffs Darius Clarke, M.D., and Restorative Health and Wellness, PLLC responded on September 22, 2020. (Doc. ## 200, 213). Defendants replied on October 2, 2020. (Doc. # 216). For the reasons that follow, the Motion is granted.

**I.   Background**

HealthSouth operates a for-profit inpatient rehabilitation facility (IRF) in Richmond, Virginia. (Doc. # 213-2 at ¶ 1; Doc. # 214 at 65:18-66:3). Compared to other rehabilitation settings, IRFs maintain a "high level of physician supervision" in order to provide "intensive

1

rehabilitation therapy services." Medicare Benefit Policy Manual, Ch. 1, § 110.2.4.

To be classified as an IRF, a hospital must serve an "inpatient population of whom at least 60 percent required intensive rehabilitation services for treatment of one or more of [thirteen qualifying conditions]," or who have a qualifying comorbidity. 42 CFR § 412.29(b)(1); 42 CFR § 412.622(a). The thirteen qualifying conditions are referred to as the CMS 13, and include neurological disorders. (Doc. # 213-2 at ¶ 7).

Additionally, to qualify for IRF coverage there must be a reasonable expectation at the time of admission that the patient meets IRF criteria. Namely, a patient must "generally require[]" and "reasonably be expected to actively participate in, and benefit from, an intensive rehabilitation therapy program." 42 CFR § 412.622(3). Under current industry standards, an intensive rehabilitation therapy program "generally consists of at least 3 hours of therapy . . . per day at least 5 days per week." 42 CFR § 412.622(3).

Dr. Clarke served as the medical director of HealthSouth's Richmond facility from May 2009 through October 2010. (Doc. # 213-2 at ¶ 1). During that time, two other rehabilitation physicians also worked at HealthSouth: Roger

2

Giordano, M.D., the previous medical director, (Doc. # 214 at 62:21-24), and Muhammad Vohra, M.D., an internal medicine doctor HealthSouth brought in to work with the cardiopulmonary program. (Doc. # 214 at 109:1-5). Jeffrey Ruskan served as the Richmond location's CEO during Dr. Clarke's tenure (Doc. # 207 at 10:2-14), and Terry Maxhimer served as HealthSouth's central region president. (Doc. # 213-2 at ¶ 35).

Additionally, Susan Habenicht worked at HealthSouth as both the lead clinical liaison and director of marketing. (Doc. # 205 at 15:7-16:18). Prior to admission, the Centers for Medicare and Medicaid Services (CMS) requires patients to undergo a preadmission screening conducted by a licensed or certified clinician. 42 CFR § 412.622(4). To that end, clinical liaisons like Ms. Habenicht evaluate potential patients in the field, that is, before admission to an IRF, to make an initial recommendation for admission. (Doc. # 179 at 16:14-21). A clinical liaison's screening includes

> a detailed and comprehensive review of each patient's condition and medical history, including the patient's level of function prior to the event or condition that led to the patient's need for intensive rehabilitation therapy, expected level of improvement, and the expected length of time necessary to achieve that level of improvement; an evaluation of the patient's risk for clinical complications; the conditions that caused the need

3

> for rehabilitation; the treatments needed (that is,
> physical therapy, occupational therapy, speech-
> language pathology, or prosthetics/orthotics); and
> anticipated discharge destination.

42 CFR § 412.622(4).

If a liaison deems a patient promising, he or she presents the patient assessment to a rehabilitation physician. (Doc. # 179 at 17:7-11). Using the screening as an initial basis, the physician evaluates whether the patient meets IRF admission requirements. 42 CFR § 412.622(4); (Doc. # 205 at 16:14-17:11). If the physician concurs with the liaison that admission is appropriate, the physician must document that he or she reviewed the preadmission screening and concurred with the results before the patient may be admitted. 42 CFR § 412.622(4); CMS Manual, Ch. 1 § 110.1.1.

In her role as clinical liaison, Ms. Habenicht routinely presented patients to Dr. Clarke, Dr. Giordano, and Dr. Vohra. (Doc. # 183 at ¶¶ 3-6). Based on personal clinical judgment, each physician would decide to either accept the patient or decline the patient for admission. (Id.). HealthSouth's bylaws regarding assignment of patients, at the time, read:

> No medical staff physician, including the Medical
> Director, is entitled to the assignment of
> unassigned patients who are admitted to the
> Hospital. As part of the Hospital's Chief Executive
> Officer's duties, as stated in the Hospital's
> Governing Body Bylaws, the Chief Executive Officer

4

> has sole authority for the process of the
> assignment of unassigned patients.

(Doc. # 181-1 at 8).

Between November 2009 and June 2010, Dr. Clarke communicated with Mr. Ruskan and other hospital officials about several perceived issues. (Doc. # 174-7 at 13-14). First, Dr. Clarke heard from other staff members that Ms. Habenicht often admitted patients to HealthSouth without prior physician review or approval. (Doc. # 214 at 108:8-19). Dr. Clarke expressed concern over this practice to Mr. Ruskan and Mr. Maxhimer. (Doc. # 214-9 at 77; Doc. # 174-7 at 12; Doc. # 213-11 at 3).

Second, Mr. Ruskan and other hospital officials often encouraged hospital staff to keep patient numbers high. (Doc. # 213-2 at ¶¶ 19-20). Specifically, hospital superiors frequently encouraged physicians and clinical liaisons to increase the average number of patients in the hospital on any given day (the average daily consensus, or ADC). (Doc. # 213-11 at 5-6; Doc. # 213-10 at 3; Doc. # 213-13 at 2). HealthSouth staff urged physicians to accept patients, especially if another IRF had already accepted those patients. (Doc. # 180-1; Doc. # 213-14). Dr. Clarke pushed back on accepting some of these patients, stating that they

were not suitable for an intensive rehab environment. (Doc. # 213-2 at ¶¶ 35-36; Doc. # 174-7 at 13-15).

Third, Dr. Clarke expressed concern that Ms. Habenicht was presenting patients to multiple physicians at HealthSouth. (Doc. # 174-7 at 12; Doc. # 213-11 at 3; Doc. # 213-25 at 3-4). Specifically, Dr. Clarke wrote that Ms. Habenicht "has tried to have patients admitted after I have informed her that a patient is not appropriate for admission. On more than one occasion, I have been approached by [hospital staff] about a patient that has been presented to them for possible admission after I have stated the patient was inappropriate for admission." (Doc. # 213-25 at 3).

Fourth, HealthSouth encouraged clinical liaisons to rely on the diagnosis disuse myopathy (DM) when presenting patients to physicians. (Doc. # 213-19). The medical community differs in opinion on the validity of this diagnosis. (Doc. # 213-18 at 2). Some doctors believe DM to be a CMS 13 qualified neuromuscular diagnosis, (Doc. # 178 at 97:22-25), while others believe there is no diagnostic criteria for the disease. (Doc. # 204 at 26:5-8). Dr. Clarke testified that he did not later review the medical records for any of the patients the other physicians diagnosed with

DM. (Doc. # 214 at 83:14-17, 111:12-112:3, 116:6-8, 110:22-111:2; Doc. # 214-1 at 292:24-293:2, 293:22-294:2).

After seeing HealthSouth distribute material on DM to clinical liaisons, Dr. Clarke requested more information on the disease from HealthSouth superiors. (Doc. # 178 at 97:22-25). Dr. Clarke himself used DM to diagnose patients (Doc. # 214 at 75:18-80:15), but testified that this use of DM was not fraudulent because he thought it was "a legitimate diagnosis at the time." (Id. at 76:10-16). Per Dr. Clarke, "[i]f a doc really believed that [a patient] had [DM] and they had clinical criteria to support that, then I can see why that would not be [fraud]." (Id. 82:3-5). However, after conducting independent research on the disease, Dr. Clarke verbally informed Mr. Ruskan that he would not be using DM to admit patients. (Doc. # 213-2 at ¶ 29).

Overall, it is undisputed that from November 2009 to June 2010, Dr. Clarke expressed general concern to HealthSouth that unsuitable patients were being admitted to HealthSouth. (Doc. # 213-2 at ¶ 35; Doc. # 174-7 at 12; Doc. # 214-9 at 77; Doc. # 213-25 at 3-4). On June 4, 2010, Dr. Clarke told Mr. Maxhimer that he felt current admissions practices

> have left and continue to leave the hospital
> vulnerable to governmental fines and threaten the
> viability of this hospital. [Dr. Clarke] also
> [felt] some current practices have a negative
> effect on HealthSouth's reputation and serve as an
> obstacle to increasing [their] patient volume and
> community referral sources.

(Doc. # 214-9 at 77).

In June 2010, Dr. Clarke expressed concern to Mr. Ruskan and Mr. Maxhimer that Ms. Habenicht was not presenting enough patients to him, and his census was dropping. (Doc. # 214-1 at 243:3-245:6). Dr. Clarke averred that, starting in roughly April, his admissions numbers steadily dropped. (Doc. # 213-2 at ¶¶ 31-32). By June 2010, Dr. Clarke claims he had roughly one-third of the patients he had in 2009. (Id.).

On August 4, 2010, Mr. Ruskan circulated new directions to hospital staff. (Doc. # 213-22). In this memo, Mr. Ruskan directed clinical liaisons to direct all new admissions to Dr. Clarke, except for cardiac and pulmonary patients, which were to be presented to Dr. Vohra, and "patients that have a lower functional level . . . that based on . . . previous historical experience you do not believe Dr. Clarke will accept." (Doc. # 213-22). Dr. Clarke resigned a few hours after the communication was circulated. (Doc. # 213-2 at ¶¶ 32-33; Doc. # 214-1 at 254:8-25).

On August 1, 2012, Dr. Clarke, Restorative Health and Wellness, PLLC (a professional limited liability company wholly owned and operated by Dr. Clarke) (Doc. # 214 at 19:2-20), and seven other relators filed a qui tam complaint on behalf of the United States and twenty individual states pursuant to the False Claims Act (FCA), 31 U.S.C. § 3729, et seq. (Doc. # 1). In the complaint, the relators alleged that HealthSouth fraudulently classified patients as CMS 13 compliant in violation of the FCA. (Doc. # 1).

In the original complaint, Dr. Clarke also sought relief under the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h). (Doc. # 1 at 13-14). Dr. Clarke argues that he engaged in protected activity under the second clause by voicing opposition to HealthSouth's inappropriate admissions practices and by personally refusing to admit patients using a DM diagnosis, only to face retaliation from HealthSouth in the form of constructive discharge. (Doc. # 213 at 19-20).

Healthsouth reached a settlement with the United States and various states in 2019, and the Court has dismissed with prejudice Dr. Clarke's claims on behalf of the United States (Doc. ## 79, 81, 82), and on behalf of the states. (Doc. ## 70, 131, 136). The Court retained jurisdiction over Dr.

Clarke's retaliation claim under 31 U.S.C. § 3730(h). (Doc. # 82).

On March 11, 2020, Dr. Clarke filed a third amended complaint alleging that Healthsouth retaliated against him in violation of the FCA. (Doc. # 139). HealthSouth filed a Motion for Summary Judgment on this sole count. (Doc. # 174). Dr. Clarke responded (Doc. ## 200, 213) and HealthSouth replied. (Doc. # 216). The Motion is ripe for review.

## II.  **Legal Standard**

Summary Judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing

law. <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's

response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).

### III. <u>Analysis</u>

The FCA serves as one of the primary vessels for combatting fraud against the federal government and federal programs. <u>United States ex rel. Osheroff v. Humana Inc.</u>, 776 F.3d 805, 809 (11th Cir. 2015). "Because employees naturally became a major source of information about fraud committed against the government, Congress amended the FCA in 1986 to protect employees who investigate and report fraud from the retaliatory acts of their employers." <u>Kalch v. Raytheon Tech. Servs. Co., LLC</u>, No. 6:16-cv-1529-Orl-40KRS, 2017 WL 3394240, at *3 (M.D. Fla. Aug. 8, 2017) (citing <u>Arthurs v. Global TPA LLC</u>, 208 F. Supp. 3d 1260, 1265 (M.D. Fla. 2015)). To that end, the FCA makes it illegal for an employer to retaliate against any employee, contractor, or agent for engaging in whistleblowing activities. <u>Id.</u> The FCA's anti-retaliation provision specifically states as follows:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any

> other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

To state a claim under Section 3730(h), a plaintiff must show: "(1) the employee engaged in conduct protected under the FCA; (2) the employer knew the employee was engaged in such conduct; and (3) the employer retaliated against the employee because of the protected conduct." David v. BayCare Health Sys., Inc., No. 8:19-cv-2136-T-60JSS, 2019 WL 6842085, at *4 (M.D. Fla. Dec. 16, 2019). The Court assumes, without deciding, that Dr. Clarke engaged in protected conduct by voicing opposition to HealthSouth's admissions practices and personally refusing to admit patients using a DM diagnosis, but finds that Dr. Clarke fails to raise a genuine dispute of material fact regarding the second and third prongs.

## A. **Awareness by HealthSouth**

Even if Dr. Clarke was engaged in protected activity, he does not raise a genuine dispute of material fact that HealthSouth knew he had engaged in protected conduct when he experienced the alleged retaliation.

13

Section 3730(h) does not provide a cause of action for all adverse employment actions. "The statute requires that the employer know that the employee was engaged in protected activity." Sicilia v. Boeing Co., 775 F. Supp. 2d 1243, 1254 (W.D. Wash. 2011) (citing Hopper, 91 F.3d at 1269). Unless an employer is aware that the employee is engaged in protected conduct, "the employer cannot possess the retaliatory intent necessary to establish a violation of § 3730(h)." Id.

Even taken in the light most favorable to Dr. Clarke, Dr. Clarke fails to raise a genuine dispute that HealthSouth knew Dr. Clarke was "acting in furtherance of an FCA enforcement action or other efforts to stop violations of the FCA." Hernandez v. Hernandez, No. 6:16-cv-1807-Orl-28TBS, 2017 WL 2557066, at *3 (M.D. Fla. June 12, 2017). None of the conduct Dr. Clarke labels as protected (Doc. # 174-7 at 12-13) would have put HealthSouth on notice that Dr. Clarke's actions were motivated by a desire to prevent FCA violations. Rather, all of Dr. Clarke's concerns revolve around topics with which a medical director would usually be concerned.

Dr. Clarke alleges that he raised concerns to Mr. Ruskan and other hospital officials over (1) physicians potentially admitting unsuitable patients, (Doc. # 174-7 at 12;  Doc. # 213-12 at 2); (2) Ms. Habenicht's habit of presenting patients

14

to multiple doctors (Doc. # 174-7 at 12; Doc. # 213-11 at 3; Doc. # 213-25 at 3-4); (3) Ms. Habenicht admitting patients without prior doctor approval (Doc. # 214-9 at 77); and (4) the validity of DM as a diagnosis. (Doc. # 213-18 at 2).

But Dr. Clarke admits that concern over the patient admissions process falls within the ambit of his duties as medical director. (Doc. # 213-2 at ¶ 44; Doc. # 174 at ¶ 6; Doc. # 213 at ¶ 6). Additionally, Dr. Clarke admits that rehabilitation physicians could reasonably disagree over diagnoses and the appropriateness of patient admissions. (Doc. # 214 at 62:12-16). Mr. Ruskan frequently spoke with physicians about their patient denials, especially when a clinical liaison thought a patient was admissible. (Doc. # 207 at 156:6-11). Therefore, it would not have been out of the ordinary for Dr. Clarke to be discussing any of these topics with Mr. Ruskan or other HealthSouth staff.

In this sense, Dr. Clarke's conduct is comparable to the plaintiff in Sicilia v. Boeing Co., 775 F. Supp. 2d 1243 (W.D. Wash. 2011). In that case, an employee claimed that his investigation into company fraud constituted protected conduct. However, the district court found that "[an] employer cannot be assumed to have the requisite knowledge [to support a retaliation claim] when its employee is merely

15

performing investigations incident to their job description."
Id. at 1254.

Likewise, when Dr. Clarke expressed concern over the
suitability of incoming patients, (Doc. # 174-7 at 12), the
professional conduct of the hospital's clinical liaison,
(Doc. # 174-7 at 12; Doc. # 213-11 at 3), and the validity of
a medical diagnosis (Doc. # 213-18 at 2), HealthSouth had
"every reason to believe that [Dr. Clarke] was performing his
job duties as [medical director]." Sicilia, 775 F. Supp. 2d
at 1255. These tasks are incident to Dr. Clarke's job
description, and Dr. Clarke never articulated a concern of
FCA violations, thus HealthSouth "would have no way to
distinguish whether [Dr. Clarke] was engaged in a protected
activity or merely conducting ordinary business." Hernandez,
2017 WL 2557066, at *3.

Indeed, rather than placing HealthSouth on notice that
he was engaged in protected conduct motivated by a concern of
fraud, Dr. Clarke repeatedly told his superiors that his
concern stemmed from his role as medical director. For
example, in his email to Mr. Maxhimer, Dr. Clarke wrote:

> As medical director, I feel my responsibility is to
> help create an environment that is optimal for
> patient care and the success of the hospital. I am
> familiar with inpatient rehabilitation hospitals
> facing millions of dollars in fines after audits by

16

> Medicare's Recovery Audit Contractors. I believe
> that it is part of my role to ensure that this
> hospital can survive such audits by adhering to
> regulatory requirements and admitting appropriate
> patients. I feel current practices have left and
> continue to leave the hospital vulnerable to
> governmental fines and threaten the viability of
> this hospital. I also feel some current practices
> have a negative effect on HealthSouth's reputation
> and serve as an obstacle to increasing our patient
> volume and community referral sources.

(Doc. # 214-9 at 77). Dr. Clarke ends the email by reassuring

Mr. Maxhimer that he "wanted to make you aware of my concerns,

because I want to help ensure the continued success of this

hospital." (Id.).

Far from putting HealthSouth on notice that he was

engaged in protected activity, Dr. Clarke's statements

affirmatively reassured Mr. Maxhimer that he was "just doing

his job." United States v. KForce Gov't Sols., Inc., No. 8:13-

cv-1517-T-36TBM, 2014 WL 5823460, at *10 (M.D. Fla. Nov. 10,

2014); Hernandez, 2017 WL 2557066, at *3. Dr. Clarke therefore

fails to raise a genuine dispute regarding whether

HealthSouth had requisite intent for a retaliation claim.

### B.   **Adverse action because of protected conduct**

"Courts in the Eleventh Circuit and other courts across

the country make clear that the causal relationship between

protected conduct and retaliatory action is an essential

element of an FCA retaliation claim." Brunson v. Narrows

<u>Health & Wellness LLC</u>, No. 2:06-CV-1148-AR, 2008 WL 11422063, at *8 (N.D. Ala. Mar. 31, 2008). Dr. Clarke makes two main arguments regarding this prong, but neither create a genuine dispute that he experienced an adverse employment action because of his protected conduct.

### 1. <u>Knowledge of fraud</u>

First, Dr. Clarke alleges that once he discovered HealthSouth's fraudulent practices, the "specter of civil or criminal liability" forced him to resign in August 2010. (Doc. # 139 at ¶¶ 59, 62-63; Doc. # 213 at 19). But Dr. Clarke does not raise a genuine dispute that this adverse action was **because** of his protected conduct.

A causal relationship is essential to an FCA retaliation claim. <u>Brunson</u>, 2008 WL 11422063, at *8. But Dr. Clarke testified that the inappropriate pressure from Mr. Ruskan and Ms. Habenicht to admit patients began "early on." (Doc. # 214 at 143:1-15, 60:17-61:4). Dr. Clarke continued: "I raised concerns throughout my time at HealthSouth about the admission process, and, you know, kept trying to work to see if it could get fixed, and it never did." (Doc. # 214-1 at 251:3-11). Such evidence indicates HealthSouth was pressuring Dr. Clarke to diagnose patients with DM both before and after his alleged protected conduct.

This situation mirrors the plaintiff's argument in Brunson. In that case, the plaintiff argued her employer constructively discharged her by requiring her to engage in fraudulent billing practices. The district court found the plaintiff oversaw allegedly fraudulent transactions both before and after she engaged in her protected conduct. Brunson, 2008 WL 11422063, at *7. Since "[the employer] did not alter its treatment or mistreatment of [the plaintiff] subsequent to her complaints regarding its billing practice . . . [the plaintiff] cannot prove that [the employer] had the requisite retaliatory intent." Id. at *8.

Likewise, Dr. Clarke testified that the pressure to admit unsuitable patients preceded his complaints about the practice and continued unabated after he voiced his concerns. (Doc. # 214-1 at 251:3-11). Like the plaintiff in Brunson, Dr. Clarke fails to show how things "changed in any way after or as a result of [his] complaints." Brunson, 2008 WL 11422063 at *8. Accordingly, this argument cannot satisfy the causation prong required for a retaliation claim.

## 2. Reduction in patients

Alternatively, Dr. Clarke claims that because of his alleged protected conduct — i.e. refusing to diagnose patients with DM — Mr. Ruskan began to bypass him and send

all new admissions to other doctors. By cutting his patient load and "decimat[ing]" his income, Dr. Clarke argues HealthSouth effectively forced him to quit. (Doc. # 213 at 11). Dr. Clarke fails to raise a genuine dispute that the bypassing was because of his protected conduct.

"After a defendant provides a legitimate, nondiscriminatory reason for [an adverse employment action] in response to the plaintiff's prima facie showing, the plaintiff bears the burden of persuasion that the proffered reasons are pre-textual." Humphrey v. Sears, Roebuck, and Co., 192 F. Supp. 2d 1371, 1374 (S.D. Fla. 2002).

Here, Ms. Habenicht and Mr. Ruskan both testified that Dr. Clarke routinely denied low-functioning patients that other physicians accepted. (Doc. # 179 at 171:13-173:11, 175:2-24; Doc. # 176 at 156:16-157:23). HealthSouth argues that the decision to bypass Dr. Clarke was based on this history of denying certain kinds of patients that other physicians tended to accept. (Doc. # 174 at ¶¶ 32, 25).

Dr. Clarke fails to provide any evidence from which a reasonable jury could conclude otherwise. Dr. Clarke admitted that the bylaws give HealthSouth ultimate authority to assign patients (Doc. # 214 at 113:16-114:8), and testified that he previously did not have any issue with patients he denied

being presented to other physicians. (Doc. # 214 at 67:6, Doc. # 214-1 at 241:4-8, 232:3-233:11).

The only support Dr. Clarke cites for retaliatory intent is a physician shopping memo and an email from Mr. Ruskan. But the plain language of the physician shopping memo directs clinical liaisons to present "[a]ll potential admissions" to Dr. Clarke with two exceptions: (1) specialized cardiac and pulmonary patients, which were to be presented to specialist Dr. Vohra, and (2) "patients that have a lower functional level . . . that based on . . . previous historical experience you do not believe Dr. Clarke will accept." (Doc. # 213-22). Such language only confirms that HealthSouth was presenting a class of patients historically denied by Dr. Clarke to other physicians.

Nor does Mr. Ruskan's email establish pretext. The verbatim language of the email reads: "A lot of Dr[.] Clarke discussion. We need plans B and C for volume. We are going to have to bypass him if he is denying." (Doc. # 213-20 at 2). A reasonable jury would not infer pretext from this language, as it merely confirms that Mr. Ruskan was sending patients to Dr. Giordano and Dr. Vohra because Dr. Clarke denied patients in the past. This is in line with HealthSouth's proffered

reason for presenting patients to physicians other than Dr. Clarke.

Therefore, the record evidence supports a finding that HealthSouth had a legitimate, nonretaliatory reason (Dr. Clarke's history of denying similar patients) for presenting patients to the other physicians. Dr. Clarke fails to provide evidence from which a reasonable jury could determine that this reason was pretext, and his "own evaluation and opinion is insufficient to establish pretext." Ferrare v. Morton Plant Mease Health Care, Inc., No. 8:08-cv-1689-T-36MAP, 2014 WL 5336481, at *6 (M.D. Fla. Oct. 20, 2014).

Even if Dr. Clarke could establish pretext, and show that his reduction in patients was because of protected conduct, proving constructive discharge is a heavy burden. Bennett v. Pipe Work Sols., LLC, No. 1:17-CV858-CLM, 2020 WL 1479154, at *6 (N.D. Ala. Mar. 26, 2020) (citing Poole v. Country Club of Columbus, 129 F.3d 551, 553 (11th Cir. 1997)). To prove constructive discharge, Dr. Clarke must show that "the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be **compelled** to resign." Wolf v. MWH Constructors, Inc., 34 F. Supp. 3d 1213, 1225 (M.D. Fla. 2014) (citations omitted) (emphasis added).

Dr. Clarke fails to show how a drop in patients created a situation that was so intolerable that any reasonable person would have quit. First, Dr. Clarke began applying to other jobs in December 2009. (Doc. # 214 at 190:15-191:17). However, he stayed on at HealthSouth for almost a full year longer. (Doc. # 214-1 at 254:8-25). Courts have found that staying on at a job after contemplating leaving weighs against a finding of constructive discharge. See Gonima v. Manatee Cnty. Sch. Bd., No. 8:05-cv-512-T-17TBM, 2007 WL 1222577, at *8 (M.D. Fla. Apr. 24, 2007) (finding a plaintiff was not constructively discharged where he "remained at his job with the [defendant] long after he contemplated finding another employment").

Additionally, although a drop in patients does represent a decrease in income, Dr. Clarke fails to raise a genuine dispute that this change was so intolerable that any reasonable person in the same situation would have quit. "A resignation is considered voluntary if the plaintiff had a choice, even if the alternatives to resignation may be unpleasant." Bennett, 2020 WL 1479154, at *6 (citation omitted). Although a reasonable person in Dr. Clarke's situation may have "chosen to resign" in order to find a higher salary, Dr. Clarke does not raise a genuine dispute

that a reasonable person would have been "compelled to do so." Id. Dr. Clarke thus fails to satisfy the "heavy burden" that accompanies a claim of constructive discharge. Id.

**C.   Conclusion**

Dr. Clarke fails to create a genuine dispute of material fact for at least two of the three prongs of an FCA retaliation claim. Therefore, summary judgment for Defendants is proper.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendants Healthsouth Corporation and Rehabilitation Hospital Corporation of America, LLC's Motion for Summary Judgment (Doc. # 174) is **GRANTED.**

(2)   The Clerk shall enter judgment accordingly and **CLOSE** this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 15th day of January, 2021.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

24